Number 232101, and Mr. Singh, we will hear from you. May it please the Court, I'm Vijendra Singh for the appellant. The standard for treating opioid use disorder requires at least two components. The first is medicines, like methadone, that can alleviate short-term cravings. But the second, equally or more important, is the provision of therapy, things like cognitive behavioral therapy, that can address the underlying causes of addiction. Our complaint alleges that in September 2020, the defendant's treatment centers stopped providing therapy but continued dispensing drugs. This took the facilities outside of compliance with core conditions of their certification and provision of opioid treatment to government beneficiaries. Nevertheless, they continued to bill the government as if all of the services were provided. And perhaps most shockingly, they prepared false notes indicating that fictional therapy sessions had occurred. Crediting these allegations as true, they state multiple violations of the False Claims Act, which protects the government from fraud on its healthcare programs, among other programs, and ensures that those programs can function with integrity and provide services to the government's beneficiaries. So can I, there was some language in your brief that suggested that they had obtained certification based on false premises, but just to make clear, your claim now, and I think this is the claim in your complaint, is they were providing these services, and then at some point they stopped providing these. It's not that they never, it's not like a whole bunch of people got together and said, like, let's have a pill mill from the beginning. That's not the claim. That is correct, Your Honor. However, the certifications do have to be periodically renewed. That's every three years. And so in the relevant time period between then and now, a renewal has taken place. A renewal, not an initial certification. That's correct, Your Honor. But the requirements for renewal are no different than the requirements for initial certification. And so that's the basis of the fraudulent inducement claim that we've discussed. The idea that you get to be certified, get to provide these services. You're required to certify your compliance with the requirements that we talked about in the brief, including the provision of clinically adequate therapy services, including keeping a recordkeeping system that is adequate to document patient care. And during the relevant time period, they did not have that. So that, I think you just addressed a question that I, I have a whole series of questions. Like, crediting for the sake of argument that there's, at least we have to, that there are these false therapy notes. One question, like, why is someone creating these false therapy notes? The allegation in the complaint is not they make these false therapy notes, and then they submit these false therapy notes, along with their repressor payment, right? Like, what's the reason that a person would create these false notes, in your view? Is it auditing related, like you just alluded to? That's right, Your Honor. We think the only reason to create a false therapy note is so that if somebody comes knocking to ask, hey, where are the patient records relating to these therapy sessions, you can say, here they are. And you have them ready to go. And those audits do occur in connection with government health care programs. States and the federal government can conduct these audits. That is the only reason I can think of why such notes would be created. They serve no other function other than to... If the false notes were not presented, so why isn't your case like Nathan and Grant, where there was no false notes presented? Your Honor, in... False documents presented. So, Your Honor, what is presented are the claims, the claims for payment, the requests for reimbursement that go to the government programs. And our argument is that those claims are false. In the case of Medicare, we argue that they are false under the implied false certification theory. And that is to say, when Medicare receives a claim using the bundled billing code. So the bundled billing code is a code that you can use if you've provided at least one of the covered services. And that would be medicine. It also includes therapy, dispensing medicine, and other services as well. We say that a core assumption behind allowing them to use the bundled billing code is that they actually have available and are providing the full suite of required services. When, as here, critical services are not being provided, the bundled billing code is implicitly false. Because it is suggesting we have provided the appropriate services for this patient in this week. It is not... Are you suggesting under the bundled billing code they have to have provided every single one of the services in the suite? No, Your Honor. That's exactly why the bundled billing code exists. It's because, let's say, for example, a patient needs therapy twice a month, but they need medicine every day. You would use the bundled billing code every single week, and it would encompass all of those things. And it would be okay if that's what you were doing. Because the idea behind the bundled billing code was to make it easy for providers to bill when there were these variations in treatment from week to week. But what it is not an excuse for is not providing critically important services to patients at any point in time and saying, yep, here's the bundled billing code. That's why it's implicitly false. Can I just make... There's a lot of claims here, and I have a whole chart and everything. And just so I understand, so you are not... This is the only theory on which there would be falsity for the bundled billing, right? You agree with the district court that you can't show falsity kind of the old-fashioned way, that each bill was itself false. That's correct. This and fraudulent inducement both relate to the Medicare appendix. Not in the same way as over on the fee-for-service side you can say, look, you billed for group therapy and there was no group therapy. That's correct, Your Honor. And so the district court here did believe that the bundled billing code does not imply the provision of these services. We think that's a clear legal error that this court should correct. As I've explained, the point of the bundled billing code, precisely because it doesn't require services to be enumerated, it rests on the fundamental assumption that therapy services are being provided. In fact, when the bundled billing code was created, and we have this cited in our briefs, the government assumed that there would be regular therapy sessions and it put that in the federal register. And when it set the amount that you get for the bundled billing code, there's a drug amount and a non-drug amount. And the non-drug amount necessarily makes assumptions about what kinds of services are being regularly provided. Isn't the non-drug amount more than the drug amount? It is for all of the ingestible drugs. For the injectables, it's a little different. But yes, for most of the claims in this case, it's more, which tells you what the government is putting emphasis on and really paying for. When you're thinking about, for example, materiality in this case, what are they paying for? The non-drug stuff more than the drugs. And so when you have a service that's not providing the non-drug therapy, that's a major issue for materiality. »» About materiality, what is the best fact in the complaint? And I'm going to preface this by saying an allegation that does not itself contain the word materiality, because that creates like a 12-milliac ball problem, like you can't prove something's material by alleging it's material. What is the best fact in the complaint showing the false therapy notes would have influenced the government's decision to pay the claims? »» So what I believe to be true is the way that I would consider materiality in the context of the false therapy notes specifically is I would say if the government knew that there were falsified therapy notes and no therapy sessions, would it believe that they had complied with the conditions of certification, would it determine that they had complied with the conditions of certification? And I think the answer is a clear no, and we allege that in the complaint. And would it believe that the claims involving the bundled billing codes were accurate? And for the reasons that I just gave you, that the amounts are calibrated. »» Where is that articulated in the complaint most cleanly in your view? »» Sure. As it relates to the point about certification, I will, I've got paragraph citations I can give you about that. If it's okay, I'll do it when I get back up to give you the precise citations. I don't want to misstate. »» If this was a case not where there were false records of therapy being provided, but simply there was no therapy provided and no false notes. Same bills, same facts, just no false therapy bills created. Would that be a different case? Does this turn on the fact that they falsified records or does it turn on the fact that they didn't provide the therapy? »» The latter, Your Honor. I think there would still be a valid claim in the hypothetical you described. But the reason why I think the false therapy notes are quite important is because they shed a lot of light on what was really going on here. You know, I have a lot of sympathy for healthcare providers who during the pandemic found it hard to provide services. You could imagine providers who really tried their best and sometimes weren't able to do it. Here, but sympathy runs out, I think, when you have a pile of fake records. And so I think that what the false therapy notes show you is that this was real fraud. This was not just negligence or failure to do enough. So they go to see enter, which is not an element that's really been disputed in the district court or on appeal. That's why I think it could be relevant. But I do think in your hypothetical, if they're doing it knowingly and they're doing it with the same center as we have here, it's the same claim. »» Can I ask you a question about the implied certification theory for the bundled billing under Medicare? So the theory is that the company is impliedly certifying that they've complied with the adequate counseling regulation? »» And the record keeping regulation, sure. »» Let's start with adequate counseling. And that's material. And I see how the complaint alleges very particularly that they're not providing adequate group counseling. But I'm not sure I see sort of a comparably particularized allegation on the individual therapy side. And there are allegations that these are happening by phone and they're cursory. But what would you point me to as sort of the most kind of concrete and specific allegation that they are failing to comply with the individual counseling end of adequate counseling? »» Yeah. So the allegations you just described are them. They're on pages 90 and 91 of the joint appendix. And what we do say, and I think crediting these allegations as true, it is sufficient. We say they did two things that were wrong with regard to individual therapy. They stopped providing in-person therapy and shifted to phone-only therapy, even though they did not first attempt to discern whether more involved methods of communication were available for particular beneficiaries. And second, the calls themselves were cursory phone calls where no real therapy occurred, brief check-ins and things of that nature. »» And I seem to remember that when you get to those allegations, they all get very caveat. They frequently didn't involve much or they generally speaking didn't involve adequate therapy. On group therapy, the complaint makes some very strong claims like we stopped group therapy. And when I look at the allegations about individuals, it's like often, most often, frequently, minimal, not adequate. It starts to get really caveated really fast. »» That's true. But I don't think the caveat hurts us at all. »» I don't think there was a single phone call that really went through the thing. No, we can't say that. But the point is that by and large, they weren't. And that is something our client does know and can allege. And once you have that, I think that gets you essentially to where you need to be in terms of whether we are stating a claim. Because the requirements to provide individual therapy require that it be clinically adequate. It's not whatever the provider decides to call individual therapy is going to be good enough. »» And I know that mens rea, it's not really an issue as this case comes up on appeal. But I do feel like if the thrust of your allegation is, look, this counseling was too cursory and it was not adequate. You also have to show and allege and everybody knew it. And whether something is adequate or not, it just seems I have some anxiety around that. »» I understand the point, Your Honor. And that probably will be a debate. But standards of care are always debated. They're debated in medical malpractice cases. They're debated in False Claims Act cases. Experts talk about them and courts figure them out. That's not really a basis, I think, to throw the case out at the pleading stage. That's really more a matter for the proofs. But even if you don't like any of the allegations about individual therapy, we have at least one clear false claim based only on group therapy. The claims that we have about patient six that we talk about. This is a patient who was only ever given recommendations for group therapy. They talked to a counselor who said in their treatment plan they would benefit from group therapy. They had false group therapy notes put in their file. They did not receive any group therapy. I think that's a reasonable example of a false claim. »» Patient six tees up something I wanted to ask you about, which is a conceptual question. Assume for the sake of argument that I think your allegations about Asheville are sufficient, that I probably think your allegations about other clinics in North Carolina are sufficient, but that I think your allegations about outside of North Carolina, let's just say, are egregiously insufficient. Let me rephrase. If those are the only allegations you had, I would be like, that is nowhere near close. So is there like a... Do we then dismiss the non-North Carolina claims or affirm the dismissal of the non-court? I've been trying to figure this out, but then I realized that in most contexts what I'm thinking about would be dealt with through standing or class certification. Like, for example, if I allege someone discriminated against me based on a prohibited ground at my place in North Carolina, and then it's like I hear other people are being discriminated against in Seattle. I mean, the reason that case would get thrown out is because A, I don't have standing, and B, I can't get class certification under Wal-Mart. But how does that work in the False Claims Act concept conceptually, where the plaintiff alleges sufficient stuff about place X, but then makes broader allegations about place Y? Yep. I see time's up. I'll try my best to answer it. So the relevant inquiry you're looking at is the Rule 9B inquiry. Are these allegations particular enough? And the way we think Rule 9B works and the way we think it has to work is that it's sort of a binary inquiry. That is, have we stated a claim? And if we have, then the full scope of the fraud is really a question to be dealt with after discovery. What you want with Rule 9B is you want the defendants to have notice of what we're accusing them of. They have that. They have not said otherwise. And you want this to be the type of case that isn't based on mere speculation where all the evidence needs to be acquired in discovery. We have that, too. We have the false therapy notes that we have here. We have personal observations. We have other evidence that's gathered pre-discovery, which is sufficient to cross the Rule 9B threshold. Now, I don't think courts parse that threshold on a claim-by-claim, facility-by-facility, government-program-by-government-program basis. I think they do it holistically. Are you familiar with our decision in Taylor v. Boiko where we seem to have affirmed that kind of thing? Yeah. So I think that this case is quite different from that one. And I guess the way that I put it is— But we did affirm—like in that case, we were like, the claims involving the relator are fine. The other claims dismissal affirmed because there's basically insufficient allegations about them. Yes. So I think here we do have more allegations, but I'm taking for purposes of the question your idea that we don't. I think the right way to look at them, to look at this, is as a threshold question. And once the threshold is crossed, it's crossed for the whole claim. And the reason I think that's correct, there's a couple. The first is when you have these False Claims Act cases where there may be hundreds or thousands of claims, there's almost going to be nobody anywhere who can ever plead a complaint that touches them. And so what you would effectively be doing is creating a rule of law that says, you know, there's no enforcement action against the worst claims, the worst frauds. I think that's an important consideration in this context. Second, I think the question really goes to, are the allegations addressing some sort of root cause that could be triggering the more widespread behavior? If our allegations were really only about the behavior of particular clinicians or supervisors at one facility, then I think there would be a better argument to say you've got to limit the case somewhat. Here, however, we have allegations that say it's happening at this facility through conversations with others. We know it's happening at least throughout North Carolina. And then the false therapy notes are being reviewed at the corporate level and edits are being made to them suggesting that it's going broader still. I think that's enough to cross the Rule 9b threshold. Now, when this case goes further, when we're doing summary judgment or trial, we're going to have to prove this up. There is no doubt about that. And if the evidence is not there to sustain the idea that there are claims, false claims of a similar kind elsewhere, then those claims will not be actionable. But I think that for purposes of the Rule 9b pleading threshold, the right way to look at it is, is there enough in this complaint to satisfy those two purposes of Rule 9b for the case? And if there is, we talk about the rest later. Before we let you sit down, I'm sorry, can I just ask a quick question about, I can't remember, is it count six, the reverse false claim? Okay. So tell me if I'm wrong, but it seems as though the question here, whether we have an obligation, is whether the obligation here, which I think is the stipulated penalties for violating the CIA, whether those are established by the contract itself or whether they sort of come into being when the government takes some discretionary action. Okay. So explain to me why the obligations, the stipulated penalties here are sort of created by contract and don't require the government to take some action. Sure. The way the contract is phrased, so at a broad level, corporate integrity agreements are basically designed to create these obligations. They're designed to say you're taking on these obligations to do these compliance things. When you fail to do so, you are stipulating the penalties, effectively liquidated damages for these things, that you will pay us to streamline the enforcement action, right, to make it so that the government doesn't have to do nearly as much discretionary stuff as it would have to do to, for example, bring a false claims act case. And so here, what the contract says is it says there are specific stipulated penalties for each of these violations, the reporting violations, the training violations that we talk about. It also indicates when those penalties start to accrue. They start to accrue from the day of the violation itself in many cases. It says the date the obligation becomes due. I don't know what that means. That sounds like when someone sues for it and now you have an obligation to pay the money. I think it's the obligation to report or to provide the training, is the obligation that I believe is being referenced there. Whether that's ambiguous or not, the other side has not made the argument that that's ambiguous. So I don't think that argument is really before you. We haven't briefed it for that reason. All they have said is that because some discretionary action is necessary, you can't have anything there and they haven't grappled with the contractual language at all. The fair reading of the stipulated penalty begins to accrue on the day after the date the obligation became due. They're not just saying sort of how many days you're going to, they're not saying that on the first day we ask we sue you for every following day. You think it's the day you were supposed to do the thing. And so we think the penalties basically accrue automatically from the violations and as a result the obligation is mature enough. The tricky thing about the reverse FCA provision is that there's a tension in the language. It talks about an established duty and then says whether or not fixed. And so you have to figure out how can something be established but not fixed. I think Congress spelled that out in the legislative history when it said contingent contractual obligations are included. And so to the extent that you think there's an ambiguity there, I think that's the ambiguity every court has wrestled with. It's resolved in this case by what Congress actually said. So does that mean that any contract, what if it didn't have these stipulated damages, provisions, like would that still count as just a not fixed? The way I would put it is that if the contract obligates you to pay and the only thing the counterparty to the contract has to do is say pay me and you're required to do it, that's enough. The decision to have them say pay me can't be a block because then you could never have one of these claims based on a contract. You could imagine that if, for example, we had a contract where I said if I file a brief less than 10,000 words, I get 100 bucks or something like that. And then in that case, and I lie about the word count or exclude the word count certificate trying to get out of a, or let's say I had to pay you if I did more than 10,000 words and I don't include the word count certificate, then that would be a clear example of where I have an obligation. I owe you the 100 bucks, but you still have to come collect probably. Otherwise you've waived your right to do so. So I think that's how this contract works and how these generally ought to work. Okay, Judge Berner, do you have? No, thank you. Everyone else is prepared to let you sit down. Good morning. My name is Jennifer Weaver and I am counsel for the respondents. May it please the court. Despite the impressive length of Ms. Wheeler's amended complaint and the very well composed recasting of its allegations, what I want to focus the court on is the central and most important requirement for any False Claims Act complaint. And that is specific facts that show with plausibility and particularity that an actual false claim was submitted to the government for payment. And that's something that no matter what theory the relator is espousing here and that theories have shifted, this fundamental rule applies to all four of the direct false claims counts, counts one, two, four, and five. Well, can I ask you on the fee for service claims, which I think is four or five, the non-Medicare claims, the allegation, right, is build the government for services, group therapy, that did not exist. And then you covered yourselves with these fake notes. On these claims, you're not disputing falsity or materiality, are you? Yes, I am. Okay. Tell me why those would not be false claims. So for, to plead falsity, again, whether it's fraudulent inducement or false certification. No, I'm sorry. Did I say it wrong? I meant not the ones that are coming in under the implied certification or fraudulent inducement ones, but the ones that just say you build these non-Medicare providers. You said please pay me for group therapy. You coded it. I provided group therapy. And in fact, there was no group therapy. You were billing for nonexistent services. That would be false, right? That would be false if it were adequately pled under this court's precedence in both, I mean, throughout from the Nathan case. Well, to plead that, they say you billed for group therapy that you did not provide. You think that's not in the complaint? It's not in the complaint. And let me explain why. So presentment, that a false claim is presented to the government. I'm just asking, before we get to presentment, assume this thing was presented to the government and it said please pay me for group therapy services and you did not provide group therapy services. That would be, I think, false? Assuming, again, that it was adequately pled, that there were facts, and this, again, in the grant test. I don't see why you, I mean, the district court certainly assumed that these would be false. Is this really where you want to plant your flag? I was just trying to get you to say, yeah, obviously false, but they have a problem on presentment. That's what the district court said. Yeah. It would be false, again, but it had to be based on facts that can either show a false claim was submitted or that it was necessarily submitted. Okay. So you just want to talk about presentment. I really am just trying to check through my chart. Assume hypothetical person asks me. Handed the government a piece of paper. I go to the government and say here are my receipts for my trip to Richmond. In fact, I stayed home. That's false, right? Yes. If you can assume that, which this Court's precedent advises against assuming. But that's presentment. And then the second is if I say here's my receipt for my trip to Richmond and the government, and, you know, please pay me $800 for my hotel, and I'm asking for $800, that's pretty clearly material, right? Because I'm asking to be reimbursed for a specific amount of money that I was not in fact expended. That's obviously material, right? Yes. And that's why I think that that's the key that ties these all together. That's fine. I just want to make sure we're all on the same part of the argument. And that's why, again, there's been a well-made argument, but it's untethered from the facts that are pled in the complaint. And we need specific facts. And when we kind of look in, and I want to focus the Court's attention on the facts that are actually pled, not as described. And so the only facts about any claim that was submitted to the government that plausibly was submitted to the government is for patient six. That's the only federal healthcare program patient identified in the complaint. And so what are those facts that are pled in the complaint? One, that patient six is a Medicare and Medicaid dual eligible. And as the relator admits in paragraph 372 of the amended complaint, Medicare is the primary payer for such dual eligibles, meaning the claim for patient six would be submitted to Medicare. And then relator admits at paragraph 244 of the amended complaint that these are, as we've discussed, are submitted on a weekly bundle. And those services that are included in the bundle, and this is at 42 CFR 410.67B. The services are the drug itself, methadone or buprenorphine, dispensing or administration, substance use counseling, individual or group therapy, and again, counseling and therapy are two separate services. And then individual therapy is different than group therapy. Toxicology testing, intake activities, and periodic assessments. So that's the services that are included, covered by the bundle. To bill Medicare for patient six, only one of those services needs to be provided any given week. Relator alleges in the amended complaint that patient six received methadone, that's one service. Relator alleges in paragraph 622 through 627 that a counselor met with patient six on July 13th of 2021 to update his treatment plan. And that during that meeting, patient six told the counselor he was struggling to stay abstinent and he had a hard time processing his past traumas. So that's substance use counseling, that's another service. Relator alleges that his patient six treatment plan notes, two previous drug screens were positive. Can I, just because we are so short on time, so am I understanding right that your point about patient six is that, what is your point about patient six? My point about patient six, which is the only facts to support that a claim was submitted to the government or necessarily submitted to the government. Show that patient six, there was no false claim at all. Because that's a Medicare claim, but when we're over on the fee for service claims, counts four and five, I think your colleague actually concedes, they don't have a specific claim being presented. They are instead trying to come in under the sort of alternative way, we have said you can meet that element, which is by alleging a pattern that would necessarily lead to the submission of false claims. And so my question for you is, I mean, there's a lot in here about the pattern, detail about how the billing works, and you have the allegation that these bills are routinely paid, and you have the false notes. And I'm really stuck on that, because why would you be making all these false notes about nonexistent, I don't mean you personally, why would one make false notes about nonexistent group therapy sessions if you weren't planning on billing for them? What would be the purpose of those notes? Well, I mean, it's, I can't tell you what the purpose would be, because it would just be assumptions. We know that for... If we can rule out every other purpose, it's kind of not an assumption anymore. So I guess I am asking you to entertain kind of the hypothetical question. If these notes are not being made to cover up what will be false submissions, what purpose could a health care provider have for producing intentionally, as alleged, false notes of group therapy sessions that never happened? Well, I mean, to speculate on that, it could be for patients that are not government patients. It's some other requirement for a... Plan or something that has nothing to do with a government patient. Because we can't assume, again, I think it's telling... So that's your answer. To defraud someone else. To defraud somebody not the government. Or that there was some, I mean, to engage in... That might be a perfectly good answer. I just want you to... Yeah, it's hard, because it's, and that's the whole point of this, is that I'm forced to think about, you know, what could have happened... There is case law that relies on things like this and says, because we cannot think of any purpose for these specifically alleged cover-up activities, we can think of no purpose other than to support a false claim. We are going to say that this pattern necessarily did lead to the submission of false claims. So the case law kind of forces us to answer this question. And I know you want to keep fighting the premise, but I'm telling you, the precedent requires me to ask that question. So an answer would be good. Yeah, and could it be that it was for, you know, assuming it happens, of course we're going to contest that that is true. But for some, you know, reason regarding the individual's job requirements that they were trying to maintain, that they were doing certain things that they were required to keep their employment, even if it had nothing to do with a federal health care program patient or any claim that was submitted to the government for payment? I mean, that's possible. Could it be for, again, for non-governmental patients? It's just very hard to... But the complaint alleges that two-thirds of, I think it does, the complaint does not, does it not allege that two-thirds of your client's revenue comes from the government? I believe that it does. So it can be different. If it was like the argument is for other purposes, it's like only 2% of our money comes from the government. There's no reason to believe this is for the government. But in a world where two-thirds of the revenue comes from the government, it seems like if you're going to do a massive fraud that only covers one-third of your customers, I mean, or your payers? Well, again, we're stepping away from the premise that, and this amended complaint conflates a lot of different concepts in terms of... Yeah, but there's no... I mean, whatever else you can say about what this amended complaint does and does not adequately allege, it pretty clearly adequately alleges a systematic process of creating false therapy notes. It definitely alleges that at quite a bit of level of detail. It talks a lot about group therapy notes. I think it's important to note that Medicare does not require group therapy. It's not a requirement for North Carolina Medicaid. I guess my question was about the non-Medicare claims, rather than switching over to the Medicare claims. So I do understand your argument. For what it's worth, I am really wrestling with the presentment question on the non-Medicare claims. But we may have already fully found that ground. Can I ask you a different sort of practical big picture question? Sure. Which is like, if we dismiss this complaint, how does a relator who doesn't work in billing or management ever satisfy the pleading requirements, in your view? I think that they would do it by describing with some more detail about, well, for example, Ms. Wheeler also is not a therapist or a counselor. So she not only has no involvement in billing, she has no involvement in providing counseling or therapy services. If you had a relator who was a counselor, who said that I was instructed to falsify notes to say that I provided these counseling services, that lets you maybe bring a complaint about the things that you personally were involved in, but you would say that's not enough to say anybody else could. I mean, there has to be some factual basis to back it up, other than rumor, innuendo, the idea that false claims must have been submitted or should have been submitted without sufficient facts to show that they necessarily were. And so, you know, on the implied certification, I mean, I do think because of the facts, and to go back to patient six, there's detailed facts about all of the substance, all of the services he did receive. The drugs, the counseling, the toxicology testing, the assessments, the updates to his treatment plan. That's all in there. But I do think on an implied certification theory, that false claims must have been submitted all around the country because of underlying noncompliance with different unspecified regulations. I just, I think it's the regulation, isn't it the adequate counseling regulation? Yeah, adequate substance use counseling. And again, the actual facts pled in the amended complaint describe adequate substance use counseling that patient six received. There's no allegation that patient six did not receive adequate substance use counseling. There's no allegation about a single patient anywhere in the country, not in the Asheville Clinic, not anywhere, who did not receive adequate substance use counseling. And so from that ‑‑ I think I understood their argument to be, your colleague's argument. There were some patients for whom group therapy and group therapy specifically was thought to be the most effective or adequate form of counseling. And we specifically alleged that there was no group therapy going on. So at least for some patients, they were not getting adequate therapy. Well, I think that's a question under, I think, the court's precedent in Taylor v. Boyko, Nicholson versus MedCom, North Carolina, and Nathan and Grant, that that's not sufficient. It's not specific. Unfortunately, I mean, if you look and just compare the facts pled that were found to be, to not meet 9B, especially in Taylor, are much more specific than the facts here. So to say that, I mean, patient six, the allegations in the complaint was that his treatment plan did not require group therapy. That some other unspecified patient that is not identified has a treatment plan that is never described that did require group therapy but didn't get group therapy. That, I think, is too far of a leap and an assumption. Because, again, if it leaves open the possibility that no false claim was submitted, I mean, that's what the Grant test is. You've got to shut that door. If you leave open that possibility that a false claim wasn't submitted because their treatment plan didn't require group therapy in the first place, and no one billed for group therapy because if it's Medicare, it's not even possible to do that. I think it's important just to back up and think about, again, what these services are and what the requirements actually are for medication-assisted treatment of opioid addiction. Many of these patients are patients who are in treatment for very long periods of time. You might be on methadone or buprenorphine for five, ten years to maintain your sobriety. And that's why CMS did not impose specific requirements that everybody needs all of these things. You need adequate substance use counseling as clinically necessary. Someone who's been in treatment for ten years probably isn't getting group therapy and a bunch of counseling on a frequent basis compared to a person who is just coming in and starting treatment. And so that's why there's not that specific requirement. Because we only have one patient to work from. We only have one. And we know he got adequate substance use counseling in addition to multiple other services. And so when we think about the purposes of 9B, part of it is to prevent cases from going forward when there's not substantial prediscovery evidence to support them. It's a big deal to accuse people of fraud. It's not a small thing. And so here it's telling that relator at the lower court never asked to amend to add additional facts to say, hey, look, I've got a Medicaid patient in Nashville. I've got another patient that definitely their treatment plan said they needed it, they didn't get it. There was never a request to amend to add those facts. And I think that's because if they had them, they would have asked to amend to add them. And they don't. Can I ask you a quick question about count six, the reverse false claim? Is it your understanding that there's not an obligation for purposes of the FCA if the duty to pay out the money is contingent on the government's discretionary decision? Is that your position? That is my position, and I agree with the district court's ruling and the reasoning in Sturgeon versus Farmerica where they relied. Those CIAs are virtually identical to ours here. And so what they say is that failure to comply with certain obligations may lead to the imposition of monetary penalties. The exact same provision is in the Farmerica CIA, the Acadia CIA. And so it's not as later alleged in their briefs that all that the OIG had to do was to decide to collect the penalties. No, they had to decide to impose them in the first place. And they're not required to impose stipulated penalties for any violation, no matter what. It's a discretionary decision, and they could choose to impose them or not. Okay, so actually then I think maybe I misunderstood your answer to my question. It's not your position, then, that government discretion to actually sue to recover on a contract is enough to mean that there is no obligation? There needs to be this additional government discretion. Right. I'm sorry. I misspoke. No, I think that that's the key part of the holding, is that the government's, the exercise of government discretion is what makes it not an obligation. But not just, here is my concern, if we say that the fact that nobody ever owes money in a contract case until someone sues them for it. So if we say that the government's discretion in deciding to sue on a contract is enough to mean that there's no obligation, then no contract can ever give rise to an FCA obligation, which seems inconsistent with the statutory text, which clearly contemplates contracts as one thing that can give rise to an obligation. So I'm asking you to address that concern, which your colleague raised. I think what I would say is that, you know, False Claims Act cases can definitely be predicated upon contracts, but this Court, as well as the Supreme Court, has made clear that the False Claims Act is not a vehicle for any kind of breach of contract case or anything. Right. So what would a contract have to say to give rise to an obligation that would support a reverse False Claims Act claim? It would have to be definite enough that the only thing left to do, that if, because if it's going to, you're going to accuse someone of a fraud, then a reverse False Claim, and it would be definite enough that the imposition of a false claim of the penalty, the requirement to pay, is automatic, like in a liquidated damages clause. Well, there is a liquidated damages clause. And if I understand it to be saying your stipulated penalty of $2,500 a day begins to accrue the day after the day on which you do not perform an obligation under this agreement, then is that good enough? I don't think so, because I think it's still, that provision, I think, is contingent first upon the OIG deciding to impose stipulated penalties in the first place, which they How can the OIG decide to impose the penalty when the OIG isn't aware of the fraud? I think what they've alleged is that a failure to report. And so for this claim to have any legs, what they would have to allege are, again, facts. I think they're alleging that you certified you were in compliance with the CIA when you weren't, because you weren't making the necessary reports. So that certification was false. And so now the question, just assume like all of that is alleged, so now the question is, is this obligation in this contract an obligation for purposes of the FCA? And I'm trying to figure out an answer about how much government discretion is too much. And if it's a liquidated damages clause and it says specifically it will begin to accrue on the day when you commit the breach, is that not enough? I think it accrues on the day you commit the breach in the event that the OIG still needs to decide to impose it in the first place. So it is basically, you are saying if the government retains discretion as to whether or not it wants to sue on its contractual rights, then there's no obligation. Not necessarily sue, because what the contract, the CIA Well, what else does impose the liquidated damages mean but sue and get them? Like you think there's an intervening step? When you're under a CIA, the OIG monitor can make certain decisions, and that's what it spells out here, that they can decide to impose those or not based on, you know, whatever the underlying factual circumstances are. There's a paragraph eight that says, and this is different from one through seven, that says the stipulated penalty will only begin to accrue 10 days after OIG sends a notice saying, like, yeah, we're serious about this. But the other seven don't say that. So I read the other seven to mean something different than eight, because they use different language. Eight seems to be what you're describing. The OIG decides that, yeah, I'm going to enforce these liquidated damages provisions. But one through seven doesn't have that language. Yeah, I think, but it's still, it does still have the language that the court relied on also in the Farmerica case, which, again, in any, no matter what, no matter what one of those one through eight we're looking at, it still gives the OIG discretion to impose or to not impose penalties. It's not. Where should I look for that language? I can get you the site. I'm sorry. I don't mean to put you on the spot. I will read it. It's cited in our brief, and I can find the exact page. I mean, I think it's also important here, and reverse false claims case counts also need to be pled with particularity, that Ms. Wheeler doesn't plead. I mean, she does not plead any facts that she was involved in the process of submitting reports to the OIG under the CIA. She pleads no facts about what was or was not reported, so she doesn't know any kind of representations that were made to the OIG or anything that was back. And, you know, again, it's this idea. What she says is that in her amended complaint is that, and it's a way that this reverse false claims theory kind of gets bootstrapped to turn what, in my view, are inadequately supported allegations of direct false claims to then rely upon that theory to revive them. If she doesn't have sufficient facts to show with plausibility or particularity that even for a single claim, patient six, and that's, again, within her amended complaint, that's what she said. She said, I told them about patient six, that he told me he didn't get group therapy. I looked in his charts, and it said he did get group therapy. So if we take that as true, again, why are we assuming that that would have to be reported to the OIG? He didn't bill for group therapy, his treatment plan didn't require it, and he received adequate substance use counseling. I took you way over time, so I want to give you time to wrap up, but Judge Berner, do you have questions? Thank you. Before you even start, can I ask a question about, that goes directly to what we were just talking about? So your colleague says, basically, like, look, if you can't, if you haven't sufficiently alleged counts one, two, and four and five, like, there's nothing to talk about by the time we get to six, because the failure to report that underlies your claim for the false certification of compliance with the CIA as sort of dependent on the other allegations. Is that right? I don't think so. There is some overlap in the underlying facts, but there are also things that are involved in the reverse false claims, that case that don't involve the rest. So, for example, there's a training requirement, and one of our allegations is they didn't provide that training, they didn't provide it to my client, and she says they didn't provide it to anyone. And that's completely independent of whether they violated the corporate integrity agreement in other ways. For example, by failing to report known or suspected likely violations of the law. For that one, I think our allegations say that my client reported to her superiors, as did the director of the North Wilkesboro facility, report to her superiors that these fraudulent therapy notes were being created, at which point they were told to stay in their lane and no action was taken. It was also confirmed that similar actions were occurring throughout North Carolina. We think those are reportable events under the CIA, even if they don't rise to the level of false claims independently. And so I think that it's the reverse false claims allegations are in some ways broader than the other allegations, such that that would not be true. And I think you just heard the other side basically admit that it's going to be almost impossible to bring a claim based on a contract, because in the context of the CIA, what OIG has to do to get the money is send a demand letter. That's a contractual enforcement mechanism, so they don't file a separate lawsuit. But that's the analog to filing a suit under another breached contract. It's just a streamlined procedure between these parties, no different functionally. The same level of discretionary involvement is there. And so their approach would get rid of effectively all claims under contracts for reverse false claims, which can't be right, because contracts are called out in the statute as a potential basis for reverse false claims. More broadly, I think the real focus I think of the last 20 minutes was on Rule 9B. And, you know, is there enough to show presentment of false claims? And I think that what you're seeing is an attempt to create an effectively impossible pleading standard. That is, you know, you have to have allegations that are about this specific program, this specific geography, this specific conduct. You can always ask for more particulars. But the question under Rule 9B is not, could this complaint have been more particular? It is, does this complaint satisfy the purposes of Rule 9B, providing the defendants with notice of the allegations against them? And again, even now, going through oral argument, the defendants have never suggested otherwise, other than that it does. And the second purpose is weeding out the clearly spurious cases, the ones that are just pure fishing expeditions, which this case is not. We have substantial pre-discovery evidence of pretty substantial wrongdoing. That is, the creation of false group therapy notes to paper over the fact that group therapy was not being provided to patients who needed it. These group therapy notes only exist for patients whose treatment plans say they should get group therapy. Because, again, otherwise there would be no reason to create them. And so we have facts that necessarily lead to the implication that false claims were presented. The other side's best answer to this is to say, well, maybe we were just trying to defraud somebody else. I don't think that should be an excuse, especially when, as here, they get two-thirds of their revenue from the government, and we have identified a Medicare Medicaid patient for whom the false group therapy notes were created. It's certainly not a plausible inference from the complaint that they were only doing this vis-a-vis people who were not government beneficiaries. We say they were doing it across the board. That's really enough under Rule 9B. I can understand looking at the complaint and asking, like, why can't there be more here? Why can't we also have a specific fee for service claim? Why can't we have a claim outside of North Carolina? I get it. The problem is that many times relators who are witnessing fraud, and our relator had a decent vantage point into this. She worked at the company for about seven years, starting in 2014. She saw exactly how the conduct sharply changed in the fall of 2020 and observed it for almost a year before being terminated. She had a pretty good vantage point into what was going on here, but she's not on the submitting claim side or the reporting side. What she knows is that when she raised these issues internally, she was told, stay in your lane. Even when she points out egregious misconduct, like the creation of false group therapy notes, that I think is just beyond the pale of what any honest treatment provider could reasonably do. I want to circle back to Titans I Promised You sites. We were talking about materiality for the fraud and the inducement type of claim. As we explain in the brief, what you're going to look at here is, was this essential to the bargain? Are these expressed conditions of payment, and what has the government done in similar actions? Some of our best stuff here is not actually in the complaint. It's the Rhode Island case that we talk about in the briefs, where the government has gone after an indistinguishable provider. What they have said is that these very same requirements that we're sitting under are clearly material, because they go to the essence of the bargain, they are expressed conditions, and they are the types of conditions that are so close to being conditions of payment that the fact that they are labeled conditions of participation is irrelevant. Those ones will be pages 106 to 109, and 118 and 119. But those don't talk about the Rhode Island case. They don't talk about the facts that the government said there. But we think all of that is stuff that you can consider, because the material analysis is a legal analysis. The facts that are alleged in the complaint on the pages that I told you about are, you can't be certified if you don't comply with these things, and that is effectively materiality plus. It is saying, you know, if you don't do these things, you're not qualified to dispense methadone to government beneficiaries. And there's a very good reason for that. It's because methadone is potentially highly addictive. And if you're just handing it out, that becomes indistinguishable from mere drug dealing if you're not also providing these other critical services. Judge Berner, do you have questions? No, thank you. We will allow everybody to sit down. We will come down and greet counsel, and then I'll ask that court be adjourned for the day. This honorable court stands adjourned until this afternoon. God save the United States and this honorable court.
judges: Pamela A. Harris, Toby J. Heytens, Nicole G. Berner